# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Wei-ping Zeng,**
**Petitioner Below, Petitioner**

**vs.)  No.  18-1035** (Kanawha County 17-AA-72)

**Marshall University,**
**Respondent Below, Respondent**

**FILED**
**April 20, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Wei-ping Zeng, previously a tenure-track associate professor at Respondent Marshall University, appeals the November 1, 2018, order of the Circuit Court of Kanawha County that affirmed the August 18, 2017, decision of the West Virginia Public Employees Grievance Board denying petitioner's grievance. Below, petitioner claimed respondent discriminated against him on the basis of race when it denied his application for tenure and retaliated against him for filing a grievance by terminating his employment in violation of the terms of his contract. Respondent's counsel, Anna L Faulkner and Kristi McWhirter, filed a response. Petitioner, who is self-represented, filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Marshall University ("Marshall") hired petitioner on September 1, 2009, as a tenure-track associate professor in the Department of Biochemistry and Microbiology at the Joan C. Edwards School of Medicine.[1] Petitioner's offer letter included the requirement that he obtain external grant funding. However, petitioner's "Notice of Faculty Appointment," the document by which petitioner accepted Marshall's offer of employment, did not include the external research funding requirement.

---

[1] The Marshall University School of Medicine Faculty Promotion and Tenure Regulations require tenure-track faculty to apply for and achieve tenure prior to the end of the sixth academic year of employment or else be issued a one-year terminal contract of employment.

1

In October of 2012, the Promotion and Tenure Committee ("the Committee") for the Department of Biochemistry and Microbiology conducted petitioner's mid-tenure review.[2] The Committee informed petitioner that he would have to substantially improve his teaching and research skills because, to obtain tenure, he was required to have obtained "excellence" in either teaching or research/scholarly activities. By letter dated October 12, 2012, the Committee suggested petitioner attend workshops and lectures to help with his teaching skills and named two people who could assist him in that regard. It also emphasized the need for scholarly publications and collaborations with other researchers. The Committee also informed petitioner that "it is mandatory for you to get external independent funding as stated in your contract." Petitioner claims this is the first time he learned that obtaining such funding was required for tenure. Petitioner responded in writing, stating that, "I will continue to seek external funding." He avers that this was his polite way of saying that he did not agree that he had to obtain external research funding to be tenured.

The Promotion and Tenure Committee conducted petitioner's pre-tenure review in 2014. The Committee again informed petitioner that he needed to substantially improve in several areas, including in his teaching and research/scholarly activities. The Committee also told petitioner that it did not believe Marshall would grant him tenure based upon the data available as of March of 2014.

Prior to petitioner's application for tenure, Dr. Donald Primerano, then the interim departmental chair of petitioner's department, notified the Committee and the School of Medicine's Personnel Advisory Committee that he would not be recommending petitioner for tenure. The timing of this notice did not fall within the standard tenure application protocol.

By letter dated March 24, 2015, Dr. Primerano informed petitioner that he was required to apply for tenure by October 1, 2015. Dr. Primerano also stated that if petitioner's tenure application was denied, his "contract would expire on June 30, 2016."

---

[2] Marshall's tenure process is multi-leveled. The first proceeding, the "mid-tenure" review, occurs halfway between the applicant's hire date and his or her tenure application date to provide feedback to improve the applicant's chances of receiving tenure. The second proceeding, the "pre-tenure" review, occurs a year before the tenure application for the purpose of providing additional feedback. The third proceeding is the actual tenure application. The Promotion and Tenure Committee reviews the application and makes a recommendation to the departmental chair. The departmental chair then reviews the application and makes his or her own recommendation to the reviewing committee, here, the School of Medicine's Personnel Advisory Committee, which reviews the application and makes a recommendation to the Dean of the School of Medicine. The dean then makes a final recommendation to Marshall's president, who makes the ultimate decision whether to grant or deny tenure.

Petitioner applied for tenure in October of 2015.[3] Petitioner included in his application a summary of his research history.[4] To obtain tenure, petitioner was required to have obtained a rating of "excellence" in teaching or in research/scholarly activities. Marshall reviews a tenure application solely on the applicant's achievements at Marshall and up to the point of the submission of the tenure application. Petitioner's application was reviewed under the criteria and guidelines set forth in the Marshall's School of Medicine Faculty Promotion and Tenure Regulations (the "SOM Regs"); Marshall University Policy AA-28; Higher Education Policy Commission, Series 9; and *The Greenbook*, Marshall's faculty handbook.

In reviewing petitioner's application, the Promotion and Tenure Committee applied the tenure criteria in place when petitioner was hired. The Promotion and Tenure Committee found as follows: petitioner's teaching load was minimal; he did not develop a new course, however, he did develop active learning exercises; he sat on a graduate committee and had graduate students rotate through his lab, but he was not a primary mentor to a graduate student; his teaching improved after he participated in two skills building training sessions; he did not obtain external grant funding; he had two original research publications and two national meeting presentations; and he did not demonstrate excellence in either teaching or research. The Promotion and Tenure Committee recommended that Marshall's president deny petitioner's tenure application. The Promotion and Tenure Committee forwarded its report to Dr. Donald Primerano.

Dr. Primerano concurred with the Promotion and Tenure Committee's recommendation that tenure be denied. Dr. Primerano found that petitioner's number of publications was too few

[3] As noted above, tenure-track faculty are required to apply for tenure before the end of their sixth academic year of employment. Petitioner's sixth year was the 2014-2015 academic year. However, because petitioner did not have a laboratory for the first six months of his employment, Marshall, by letter dated March 24, 2015, granted petitioner's request to postpone his tenure application until the fall of 2015.

[4] Petitioner asserts the following: He studies CD4 T cells that are a part of the immune system that is destroyed by HIV. In the past, he discovered the master regulator, GATA-3, that controls the functions and identity of a special type of CD4 T cells known as Type 2 T helper cells. Petitioner states that Th2 cells can be beneficial (they provide immunity against worm infections) or detrimental (they cause allergic diseases such as asthma). Petitioner asserts that new asthma drugs targeting GATA 3 hold great promise. Petitioner claims he continued this line of research at Marshall and that he published three articles and two review articles in prestigious scientific journals on that topic. He avers that he mapped the "hot spots" on the DNA of five types of CD4 T cells. (Petitioner notes that project was significantly delayed due to Marshall's failure to timely provide technical support in bioinformatics.) Petitioner states that this mapping will yield new research projects and funding with an eye toward developing new treatments for a variety of diseases. He claims that he also studied how bacterial toxins in the air contribute to the development of asthma, and that the results of this study were published in the best journal in his field. Petitioner avers that this asthma study will put him in a good position to seek funding to develop vaccines for the prevention of asthma, and that he was awarded a provisional patent to develop such vaccines.

for petitioner's research to be rated "excellent." Dr. Primerano rated petitioner's teaching as "satisfactory" based upon petitioner's course evaluations, teaching load, and mentorship. By letter dated October 30, 2015, Dr. Primerano notified the Dean of the School of Medicine, Dr. Joseph Shapiro, of the Promotion and Tenure Committee's recommendation, and his recommendation, to deny tenure.

The School of Medicine's Personnel Advisory Committee reviewed petitioner's tenure application and then voted unanimously to deny tenure on the ground that petitioner lacked funded research productivity and had not achieved "effective performance in all major areas of responsibility and 'excellence' in either teaching or research scholarly activities." The Promotion and Tenure Committee notified Dean Shapiro of its recommendation.

Dean Shapiro reviewed petitioner's tenure application and each of the previous recommendations. Dean Shapiro found (1) petitioner's teaching reviews were satisfactory; (2) his mentorships did not result in abstracts or publications for the students involved; (3) his research ranking was not excellent; and (4) he had obtained no external research funding. Dean Shapiro then forwarded petitioner's application and the following comments to Marshall's President, Dr. Jerome Gilbert:

> I do not recommend tenure for [petitioner]. [He] was employed in 2009 primarily to do research. Since then he has only published four research articles and two reviews. This is a very poor record based on the 60% time he has for research. Further he does minimal service and limited teaching. His references do not give compelling argument for his tenure and I was unable to find any support from his chair.

On February 8, 2016, Dean Shapiro notified petitioner that he would not recommend tenure. On March 16, 2016, petitioner met with Dr. Primerano who restated the Dean's decision. Thereafter, petitioner asked Marshall's president to intervene, without success.

Petitioner filed a questionnaire with the Equal Employment Opportunity Commission (the "EEOC") on March 21, 2016.

On April 30, 2016, Marshall's president formally denied petitioner's application for tenure. On May 5, 2016, Marshall's associate general counsel sent petitioner an e-mail stating that if petitioner withdrew his EEOC charges, waived his right to a grievance, and brought no further claims against Marshall, he would remain employed until February of 2017. On May 17, 2016, petitioner filed a grievance with the West Virginia Public Employees Grievance Board (the "Grievance Board") alleging discrimination in Marshall's denial of tenure and retaliation for opposing Marshall's discriminatory denial of tenure.

At petitioner's June 20, 2016, Level I grievance, he argued that Marshall discriminated against him in denying tenure where his job performance was comparable to or better than similarly situated employees, "Dr. K." and "Dr. D.," [5] who also worked in petitioner's department

---

[5] Petitioner compares himself to two other professors in Marshall's Department of

and who were awarded tenure, and (2) that he was the victim of unlawful discrimination due to his country of birth and ethnic identification and that faculty members of the "majority race" were awarded tenure. Marshall's defense was based, in part, on the "duties and responsibilities section" of petitioner's letter of appointment that required him to "[e]stablish . . . an independent and externally funded research program in cellular immunology." In denying petitioner's grievance, the hearing examiner found that (1) despite his many attempts to obtain external grant funding, petitioner failed to obtain such funding; and (2) the only evidence petitioner presented to support his charge of discrimination was that other applicants were granted tenure. The hearing examiner recommended that petitioner's grievance be denied.

Petitioner's employment with Marshall ended on June 30, 2016. Thereafter, petitioner's Level II mediation was unsuccessful.

Following petitioner's Level III grievance hearing, an Administrative Law Judge (the "ALJ"), entered a sixty-nine-page order on August 18, 2017, that denied petitioner's grievance. The ALJ first addressed petitioner's discrimination claim, i.e., that Asian members of Marshall's Medical School are held to a higher standard than non-Asian members. The ALJ noted that petitioner primarily focused on the differences and similarities between himself, Dr. K. and Dr. D. The ALJ found that (1) Dr. K. was treated differently than petitioner due to the differences in Dr. K.'s employment contract; (2) Dr. D. was not similarly situated to petitioner; and (3) none of

---

Biochemistry and Microbiology, Dr. "K." and Dr. "D." In that regard, petitioner claims the following: In 2011, Marshall hired Dr. K. as an associate professor, and Dr. D. as an assistant professor. Dr. K.'s and Dr. D.'s offer letters contained a list of "job responsibilities." Dr. K.'s letter required that he establish externally funded research; however, that requirement was not listed in his tenure requirements. Dr. D.'s job responsibilities required him to establish an original research program, but that was not listed in his tenure requirements. Dr. D. was also required to establish external funding; however, that requirement was automatically satisfied because he worked under a federal grant that provided external funding. Marshall asked Dr. K. to apply for tenure in 2013; he did and was awarded tenure in 2014. Marshall asked Dr. D. to apply for tenure in 2014; he did and was granted tenure and promoted to an associate professor in 2015. Petitioner avers that he, Dr. K., and Dr. D. had the same responsibilities: teaching, research, and service with similar allocations of effort. According to petitioner, he published more scholarly articles than did Dr. K. and Dr. D. and published those articles in more prestigious journals. Petitioner also claims he had a heavier medical teaching load, better teaching performance reviews, more graduate mentorships, served on more committees, and reviewed more national and international scientific reviews than either Dr. K. or Dr. D. However, petitioner admits that he had lower research scores than either Dr. K. or Dr. D. Petitioner also claims that both Dr. K.'s and Dr. D.'s offer letters contained a section that described their tenure requirements, but there were no specific tenure requirements in petitioner's offer letter. Thus, petitioner avers that his tenure requirements were the standard requirements found in the School of Medicine's Faculty Promotion and Tenure Regulations. Petitioner maintains those regulations do not require a professor to obtain external research funding. Finally, petitioner claims he has a lower salary than did Dr. K. and Dr. D.

petitioner's other claims supported bias or interference with regard to petitioner's tenure application.

The ALJ also addressed petitioner's claims that (1) any failure to obtain external grant funding should not have been a consideration regarding his tenure application, and (2) his tenure application was rejected, in part, because he did not obtain such funding. The ALJ noted that petitioner's *offer* letter included the requirement that he obtain external grants to fund research. However, petitioner's signed *acceptance* of the offer, the "Notice of Faculty Appointment," did not include the external research-funding requirement. The ALJ found that reading the offer and acceptance together, it was clear that petitioner's contract terms included both documents. Thus, by signing the acceptance, petitioner accepted the offer that required he obtain external research funding. However, because the ALJ also found that the newly formed contract did not make obtaining such funding a requirement for tenure, the ALJ also concluded that Marshall improperly considered petitioner's failure to obtain funding in its tenure decision. Therefore, the ALJ reviewed petitioner's grievance by looking only at the other factors employed in denying petitioner's tenure application. Specifically, the ALJ noted that petitioner was required to demonstrate "effective performance in all major areas of responsibility and excellence in teaching or research/scholarly activities." The ALJ then found evidence supporting the university's conclusion that, at each level of review, petitioner had not obtained excellence in teaching or research.

The ALJ also found that Dr. Primerano should not have notified the Personnel Advisory Committee and the Promotion and Tenure Committee before petitioner filed his application for tenure that he would not recommend tenure. However, the ALJ concluded that Dr. Primerano's wrongful act did not affect the outcome of petitioner's tenure application given that petitioner had previously been told that he was not on track to receive tenure.

The ALJ then reviewed the other factors relevant to the tenure decision, including: (1) the number and quality of petitioner's publications, (2) his class load and student reviews, (3) the number of courses he developed, (4) the number of times he spoke at local, national, and international research symposia, and (5) the number of medical, graduate, and undergraduate students he mentored. Having reviewed this evidence, the ALJ found that there were "rational, relevant reasons" supporting the denial of tenure.

Finally, the ALJ addressed petitioner's claim that, even if Marshall's denial of tenure was proper, Marshall wrongfully retaliated against him by failing to thereafter grant him a one-year terminal contract. Marshall responded that petitioner's grievance was untimely and that he was not entitled to a terminal contract because non-tenured faculty can only be employed for seven years, and petitioner was already in his seventh year of employment when his tenure application was denied. The ALJ found that (1) Marshall orally raised the timeliness issue at the Level I grievance and, therefore, the burden shifted to petitioner to show he had a proper basis for his untimely filing; (2) Dean Shapiro and Dr. Primerano notified petitioner by letter dated *March 24, 2015*, that he could apply for tenure in the fall of 2015, but if tenure was denied, his contract would expire on June 30, 2016; and (3) by e-mail dated *May 7, 2015*, petitioner first challenged Dean Shapiro and Dr. Primerano's March 24, 2015, letter stating petitioner's contract would expire on June 30, 2016. Thus, the ALJ determined that because petitioner waited more than fifteen days to challenge the March 24, 2015, letter, his challenge was untimely filed. W. Va. Code § 6C-2-4(a)(1) (2008)

6

("Within fifteen days following the occurrence of the event upon which the grievance is based, . . . an employee may file a written grievance[.]").

Petitioner appealed the Grievance Board's August 18, 2017, decision to the circuit court. On November 1, 2018, the Circuit Court of Kanawha County upheld the ALJ's decision and dismissed petitioner's appeal with prejudice. The circuit court found that (1) the ALJ's decision was not arbitrary, capricious, or contrary to law; (2) the ALJ properly determined that petitioner was not subjected to discrimination; (3) there was no interference in petitioner's tenure evaluation process, and (4) the portion of the grievance related to petitioner's challenge to his employment end date was untimely filed.

On appeal to this Court, petitioner raises twelve assignments of error;[6] however, he does

---

[6] Petitioner's twelve assignments of error are as follows:

1. The circuit court erred in finding that Dr. D., Dr. K., and petitioner were not similarly situated employees, where all three were hired in the same year, had the same job responsibilities, and the same job classification: tenure track faculty.

2. The circuit court erred in finding that the differences in tenure requirements, particularly the requirement of external research funding, were agreed in writing, although the petitioner was not a signatory to the offer letters describing Dr. K.'s and Dr. D.'s tenure requirements.

3. The circuit court erred in finding that adding external research funding to petitioner's tenure requirement violated Marshall University's policy, but that the violation was not harmful, even though overwhelming evidence shows that those who reviewed petitioner's tenure application considered establishing externally funded research "mandatory" for petitioner, but not for Dr. K. or Dr. D.

4. The circuit court erred in finding that the evaluation of research productivity does not need to focus on Marshall-affiliated corresponding-author research publications and the importance of the publications, and in failing to consider evidence for the continuation of petitioner's research programs.

5. The circuit court erred in finding that although the petitioner's teaching quality was not an issue, that petitioner improperly presented teaching scores, and petitioner had low teaching loads and mentoring activities.

6. The circuit court failed to find Marshall's "interferences with and/or the negative impacts thereof on the review of the petitioner's tenure application, in face of the admission of improper interferences and evidence of the negative impacts."

7

not argue each of those assignments of error in turn. Instead, his argument is contained under the following five headings:

ISSUE ONE: *Similarly Situated Employees*: Petitioner argues that he, Dr. K., and Dr. D. were similarly situated employees because they were hired in the same department, under the same classification as tenure track employees, and they all had the same responsibilities. He argues the circuit court was clearly wrong in finding otherwise.

ISSUE TWO: *Capricious and harmful addition of tenure requirement*: Petitioner argues that the addition of external funding to his tenure requirements violated Marshall's policy because obtaining external funding was not included in his offer letter. Petitioner was denied tenure based on the "absence of external funding." Thus, he asserts the circuit court was clearly wrong in finding that the external funding requirement was not harmful.

ISSUE THREE: *Arbitrary and capricious evaluation of research*: Petitioner argues that the evaluation of his productivity should have focused on all of his Marshall-affiliated publications/research articles; however, Marshall believed, and the circuit court endorsed, that

---

7. The circuit court erred in failing to find that Marshall distorted evidence to downgrade petitioner's qualifications.

8. The circuit court erred in finding that the reviewers' evaluations of petitioner's job performance were not arbitrary and capricious, even though the reviewers failed to compare petitioner with similarly situated employees, ignored and distorted factual evidence, and did not follow established policies and customs.

9. The circuit court erred in failing to find that (a) petitioner was entitled to a one-year terminal contract following the "tenure-clock year" in which tenure was denied; (b) Marshall retaliated against petitioner for opposing unlawful discrimination by premature termination of employment; and (c) Marshall failed to adhere to proper procedure for faculty non-retention.

10. The circuit court erred in finding that petitioner was legally notified of the end-date of his employment as early as March 24, 2015, and that petitioner's grievance was not timely filed.

11. The circuit court erred in failing to find that Marshall discriminated against petitioner regarding his salary, which was lower than Dr. K.'s and Dr. D.'s salaries.

12. The circuit court erred in failing to find that Marshall denied petitioner employment privilege by not letting the petitioner take over another professor's immunology teaching duties after that other professor's retirement.

8

only petitioner's first author articles should be considered. In so doing, he contends Marshall disregarded its own policies on corresponding authorship publications. He maintains his publications compared favorably with those of his peers, and a colleague in petitioner's department found petitioner's publications to be highly impactful.

ISSUE FOUR: *Arbitrary and capricious evaluation of teaching:* A. *Medical Teaching Score*: Petitioner claims that although his teaching scores were initially low, they improved each year and were not lower than departmental averages. Petitioner points out that for the 2015-16 academic year, he had an overall adjusted average score of 4.5 for the three courses in which he taught, and that achieving a score of 4 is considered excellent in medical teaching.

B. *Teaching Loads*: Petitioner argues that Dean Shapiro erroneously stated that he taught eleven hours per semester. In fact, petitioner's medical school teaching load was fifteen to seventeen hours per semester, i.e., higher than the average teaching loads, and higher than Dr. K.'s and Dr. D.'s teaching load. Petitioner claims his graduate school teaching load was also higher than Dr. K.'s and Dr. D.'s graduate school teaching loads.

C. *Arbitrary evaluation of teaching*: Petitioner contends that the circuit court erred in endorsing Marshall's rating of petitioner's teaching as only "satisfactory." Petitioner avers Marshall also wrongfully argued that petitioner (1) manipulated his teaching scores by using the wrong years and adjusted overall averages; (2) had low teaching loads; (3) developed only two active learning sessions, when he developed four such sessions; (4) did not develop a new course, when he helped his colleagues do just that; (5) did not act as a course director when he was "in effect" the course director for "Current Topics of Molecular Biology"; and (6) had the unique ability to teach diverse subjects.

ISSUE FIVE: *Premature termination and retaliation*: A. *Entitlement to terminal contract: Petitioner's implied contract guaranteed employment beyond June 30, 2016*: Petitioner argues as follows: His offer letter and the writing resetting his tenure application date created a meeting of the minds and was evidence of an implied contract. The university's *Greenbook* supports finding an implied contract given that it includes Title 133-9 § 10.3 of the Higher Education Policy Series 9, which provides that a faculty member denied tenure should be offered a one-year terminal contract. When petitioner was granted additional time to apply for tenure, he did not give up his right to a one-year terminal contract. Marshall formally notified petitioner that his tenure application was denied on April 30, 2016. "Due to the reset of [petitioner's] tenure clock, the tenure clock year of his tenure denial [ran] from Feb[ruary] 2016 to Jan[uary] 2017. As such, [] petitioner's terminal contract should run from July 2016 to June 2017." The maximum probation period "normally shall not exceed seven years[,]" but this was not a normal situation.

B. *Marshall's noncompliance with the law and the non-retention policy*: Petitioner contends that he was not timely provided notice of non-retention; thus, he was entitled to appointment for another year. Petitioner highlights that notification of non-retention must be unequivocal. Marshall claims that the interim chair and dean notified petitioner as early as March 24, 2015, that his employment would end on June 30, 2016. However, that letter was equivocal because it was contingent on the outcome of petitioner's tenure application.

9

C. *Retaliation*: Marshall retaliated against petitioner by prematurely terminating his employment after he filed an EEOC questionnaire and a grievance, both of which are protected activities.

D. *Timely filing of grievance*: West Virginia Code § 6C-2-4(a)(1) provides that an employee must filed a grievance "within fifteen days following [the event] upon which the grievance is based." "Days" means working days. W.Va. Code § 6C-2-2(c). The time period begins to run when the decision is unequivocally made known to the grievant. Here, petitioner was unequivocally notified of tenure denial on April 30, 2016. Petitioner filed his grievance on May 17, 2016, or fifteen days after he received notice of the denial of tenure.

This Court reviews petitioner's arguments under the following standards of review: First, West Virginia Code § 6C-2-5(b) (2007) defines enforcement and reviewability of decisions conducted before the Grievance Board. Specifically, the decision of an administrative law judge cannot be reversed on appeal unless the circuit court finds that the ALJ's decision:

(1) Is contrary to law or a lawfully adopted rule or written policy of the employer;
(2) Exceeds that administrative law judge's statutory authority;
(3) Is the result of fraud or deceit;
(4) Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
(5) Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.* The circuit court's scope of review of an ALJ's decision under the grievance statute is limited to the five grounds enumerated above. *Parker v. Summers Cty. Bd. of Educ.*, 185 W. Va. 313, 316, 406 S.E.2d 744, 747 (1991). In reviewing a circuit court's order regarding a Grievance Board decision, we apply the same standard of review as did the circuit court. *See* Syl. Pt. 1, *Martin v. Barbour Cty. Bd. of Educ.*, 228 W. Va. 238, 719 S.E.2d 406 (2011).

Moreover, this Court has repeatedly held that the scope of review of a Grievance Board decision is quite narrow, and a court cannot substitute its judgment for that of the administrative law judge.

Grievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and application of law to the facts, which are reviewed de novo.

Syl. Pt. 1, *Cahill v. Mercer Cty. Bd. of Educ.*, 208 W. Va. 177, 539 S.E.2d 437 (2000). An appellate court, be it the circuit court or the Supreme Court of Appeals, may not substitute its judgment for that of the administrative law judge. *See Keatley v. Mercer Cty. Bd. of Educ.*, 200 W. Va. 487, 490, 490 S.E.2d 306, 309 (1997). If the administrative law judge's conclusion is plausible when

10

viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently. *See Hanlon v. Logan Cty. Bd. of Educ.*, 201 W. Va. 305, 311, 496 S.E.2d 447, 453 (1997) (citations omitted).

Here, the circuit court, having clearly reviewed the evidence in its entirety and having given deference to the facts as found by the ALJ, found that petitioner failed to identify any violation of law, rule, or written policy, and, instead, submitted an exhaustive list of controverted factual reasons why he believed the ALJ's decision was incorrect. Having reviewed that exhaustive list, the circuit court found no valid reason to overturn the ALJ's decision because petitioner did not meet his burden of proof. Applying the standard of review found in West Virginia Code § 6C-2-5(b), the circuit court found that (1) the ALJ's decision was not arbitrary, capricious, or contrary to law; (2) the ALJ properly determined that petitioner was not subject to discrimination; (3) the ALJ found no interference in petitioner's tenure evaluation process; and (4) the ALJ correctly determined that the portion of the grievance related to petitioner's challenge to the end date of his employment was untimely.

This Court, having reviewed the circuit court's order in light of the record on appeal and the relevant law, finds no error. The ALJ's and circuit court's findings of fact are supported by the evidence and are entitled to substantial deference. Hence, we adopt the circuit court's "Final Order" entered on November 1, 2018. We likewise adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal.

The Clerk is directed to attach a copy of the circuit court's November 1, 2018, order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** April 20, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison

**NOT PARTICIPATING:**

Justice Margaret L. Workman

11

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

WEI-PING ZENG
        Petitioner,

v.
                      Civil Action No.: 17-AA-72
                      Judge Charles E. King, Jr.

MARSHALL UNIVERSITY,
        Respondent.

---

## RESPONDENT'S FINAL ORDER

---

This matter is before this Court for judicial review pursuant to *West Virginia Code* §6C-2-5. The Petitioner, Wei-Ping Zeng ("Petitioner" or "Grievant"), appeals the August 18, 2017, decision of the West Virginia Public Employees Grievance Board ("Grievance Board") which denied his grievance. In the underlying grievance, Petitioner was seeking generally to have his employment reinstated and to be granted tenure. Petitioner filed a grievance with the Grievance Board, stating, "Denial of tenure due to discrimination based on race. Early termination of employment for opposing unlawful discrimination." (Grievant's Statement of Grievance). By decision dated August 18, 2017, Administrative Law Judge ("ALJ") Billie Thacker Catlett denied the grievance, finding that the reviewers of Petitioner's tenure application "stated rational, relevant reasons supporting their denial of Grievant's tenure", and rendered a "sound" decision that was "not contrary to law or school policy or regulation". (Level III Decision, pages 2 and 61) The Petitioner now appeals.

This Court has reviewed the briefs of the Petitioner and the Respondent, the pleadings, the entire record of the proceedings below, including the ALJ's decision, and pertinent legal authority.

As a result of these deliberations, for the reasons set forth below, the Court concludes that the decision of the Grievance Board ALJ is correct and there is no basis for reversing that decision.

## SUMMARY

Petitioner was employed at Marshall University ("Marshall" or "Respondent") in the tenure-track position of Associate Professor in the Department of Biochemistry and Microbiology from September 1, 2009, until his employment contract expired on June 30, 2016. Petitioner applied for tenure during the 2015-2016 academic year, and was denied tenure on April 30, 2016, for failure to achieve excellence in either teaching or research/scholarly activities as required by the relevant tenure policies. In her Decision denying the grievance, the ALJ held that,

> [W]hen viewed as a whole, the reviewers stated rational, relevant reasons supporting their denial of Grievant's tenure. Grievant was hired primarily to research, for which he was to devote 60% of his time, and he demonstrated very little productivity in research. Grievant's teaching had improved greatly per his student evaluation scores, however, given his limited student sponsorship and teaching load, it is not unreasonable for the reviewers to consider Grievant's teaching less than excellent.

(L-III Decision, p. 60-61) The ALJ further held that the tenure reviewers' decision was "sound" and "not contrary to law or school policy or regulation", and that "the portion of the grievance related to Grievant's challenge of his employment end date is untimely." (L-III Decision, p. 2, 61)

The ALJ's lengthy decision included a comprehensive discussion of the evidence and extensive findings of fact, and she clearly based her findings of fact upon substantial evidence in the record. As the record in this matter overwhelmingly supports the ALJ's factual findings and conclusions of law, and final decision regarding denial of tenure, her decision must be AFFIRMED.

# FINDINGS OF FACT

Petitioner began employment at the Marshall University School of Medicine in the tenure-track position of Associate Professor on September 1, 2009. Tenure-track faculty are required to apply for and achieve tenure prior to the end of the sixth academic year of employment or else be issued a one-year terminal contract of employment. The Marshall University School of Medicine Faculty Promotion and Tenure Regulations ("SOM Regs") provide that

> V. Faculty Tenure . . .
> Twelve months prior to the conclusion of seven-year, probationary tenure-track, continuous employment, faculty must be either notified of termination at the end of the seventh year or awarded tenure at the end of the sixth year.

Title 133 Procedural Rule, West Virginia Higher Education Policy Commission, Series 9, Academic Freedom, Professional Responsibility, Promotion and Tenure ("HEPC Series 9"), provides that

> §10.3. The maximum period of tenure-track status normally shall not exceed seven years. Before completing the penultimate year (the critical year) of a tenure-track appointment, any non-tenured faculty member shall be given written notice of tenure, or offered a one-year written terminal contract of employment.

Marshall University Policy AA-28 Faculty Tenure ("MU-AA-28"), provides that

> §2.2.7. The maximum period of probation at Marshall University shall not exceed seven years. Before completing the sixth year of a probationary appointment, a non-tenured faculty member shall be given written notice of tenure, or shall be offered a one-year terminal contract of employment for the seventh year.

(L-III Resp, Exh. 1, 2 & 3)

Because research laboratory space was not available to Petitioner until February 2010, he was granted an exception to the tenure application deadline and allowed to apply for tenure during his seventh year of employment. (L-III Resp. Exh. 12) Accordingly, Petitioner submitted his

application for tenure in the fall of 2015, during his seventh year of employment instead of his sixth year.

The SOM Regs provide for a multi-level evaluation process for the award of tenure. Initially, the Promotion and Tenure Committee for the Department of Biochemistry and Microbiology ("Dept. P&T Committee") reviews the applicant's tenure portfolio. The Dept. P&T Committee then forwards the same with its recommendation to the Department Chair. The Chair, likewise, reviews the applicant's tenure portfolio and then forwards the portfolio with his and the prior recommendation to the School of Medicine Personnel Advisory Committee ("PAC"). The PAC reviews the applicant's tenure portfolio and then forwards the portfolio with all the recommendations to the Dean of the School of Medicine. The University President then reviews the applicant's tenure portfolio and all the prior recommendations and makes the final decision whether to award tenure. (L-III Resp. Exh. 1)

The tenure application is required to be evaluated solely on the individual's achievements while employed at Marshall, up to the point of submission of the application. Policy MU-AA-28 provides that "[t]he grant of tenure requires that a candidate must have demonstrated professional performance and achievement in all of his or her major areas of responsibility." (L-III Resp. Exh. 2) Petitioner received a Mid-tenure Review[1] in 2012 and a Pre-tenure Review in 2014, each of which reflected unfavorably on Petitioner's performance and potential for achieving tenure and included numerous recommendations for performance improvement. Both reviews clearly advised Petitioner that substantial improvement was needed in order to achieve tenure.

---

[1] The members of the Mid-Tenure Review, Pre-tenure Review, and Dept. P&T Committees were Dr. Pier Paolo Claudio, Dr. Terry W. Fenger, Dr. Hongwei Yu, and Dr. W. Elaine Hardman who served as chair of the committees.

According to the SOM Regs, "[f]or award of tenure, a faculty member should meet the criteria outlined . . . for promotion to Associate Professor." The SOM Regs provide that promotion to Associate Professor requires

> Overall evidence of superior worth to the University as demonstrated by effective performance in all major areas of responsibility and excellence in either teaching or research/scholarly activities. . . .
>
> Specific areas for consideration include, but are not limited to:
> - Teaching
> - evaluations of satisfactory or above by chairperson and peer review
> - factors considered should include the following where appropriate:
> - teaching load
> - development of new courses
> - development of syllabus material
> - student sponsorship
> - resident training
> - courses taken to improve teaching effectiveness
> - student evaluations
> - Research/Scholarly Activities
> - Evidence of establishment/continuation of research/scholarly program substantiated by publications in peer review journals, other activities and chairperson and peer review
> - Continuing presentation of research at regional, national and international scientific meetings

(L-III Resp. Exh. 1)

Petitioner's tenure application was reviewed under the criteria and guidelines set forth in the SOM Regs, MU-AA-28, HEPC Series 9, and The Greenbook[2]. (L-III Resp. Exh. 1, 2, 3 & 4). Petitioner's application was initially reviewed by the Dept. P&T Committee. Finding that Petitioner did not demonstrate excellence in either teaching or research/scholarly activities, the Dept. P&T Committee advised Dr. Don Primerano, Interim Chair, Department of Biochemistry and Microbiology, by letter dated October 26, 2015, that the Dept. P&T Committee did not recommend Petitioner for tenure. The Committee's vote was unanimous. (L-III Resp. Exh. 10)

---

[2] The Greenbook is the faculty handbook. In this case, Grievant was evaluated under the August 2015 Greenbook requirements.

Regarding Petitioner's teaching, the Dept. P&T Committee stated that "we think that Dr. Zeng demonstrates adequate teaching but do not think that Dr. Zeng demonstrates **excellence** in teaching." (Emphasis original) (L-III Resp. Exh. 10)  Regarding Petitioner's research/scholarly activities, the Dept. P&T Committee rated Petitioner's performance as "NA" (not adequate) for every criterion listed, and further stated that "[b]ased on the requirements and on the evidence that we were presented, we do not think that Dr. Zeng demonstrates **excellence** in research." (Emphasis original) (L-III Resp. Exh. 10)  The Dept. P&T Committee unanimously voted to not recommend Petitioner for tenure. (L-III Resp. Exh. 10)

Petitioner's application was reviewed next by Dr. Primerano in his capacity as Interim Chair, Department of Biochemistry and Microbiology.  By letter dated October 30, 2015, Dr. Primerano notified Dr. Joseph Shapiro, Dean of the School of Medicine, that he was not recommending Petitioner for tenure.  Dr. Primerano provided numerous reasons as to why he could not recommend Petitioner for tenure, including insufficient number of publications, lack of research funding, below average student evaluation scores, and lack of student mentorship.  (L-III Resp. Exh. 10)

Petitioner's application was reviewed next by the PAC.  Dr. Bonnie Beaver, PAC Chair, notified Petitioner and Dean Shapiro by letter dated February 28, 2016, that the PAC was not recommending Petitioner for tenure.  Reasons for the recommendation included lack of funded research productivity, and lack of evidence that Petitioner had achieved "effective performance in all major areas of responsibility and excellence in either teaching or research scholarly activities." (L-III Resp. Exh. 10)

Petitioner's application was reviewed next by Dean Shapiro, who by letter dated February 8, 2016, concurred with the recommendations of all the prior reviewers, and advised Petitioner that he was "supporting the PAC's recommendation and declining your application for tenure."

Thereafter, Dean Shapiro notified President Jerome Gilbert of his decision supporting the PAC's recommendation and that he did not recommend Petitioner for tenure. (L-III Resp. Exh. 10.) Finally, President Gilbert notified Petitioner by letter dated April 30, 2016, that his application for tenure was denied. (L-III Resp. Exh. 10)

Petitioner's employment ended on June 30, 2016, when his employment contract expired. Petitioner's underlying grievance was filed on or about May 17, 2016. The Public Employees Grievance Board rendered its decision on August 18, 2017.

## DISCUSSION

### A. Standard of Review

*West Virginia Code* §6C-2-5 (2007) defines enforcement and reviewability of decisions conducted before the West Virginia Public Employees Grievance Board. Specifically, the decision of an administrative law judge cannot be reversed on appeal unless the circuit court finds that the Administrative Law Judge's decision:

(1) Is contrary to law or a lawfully adopted rule or written policy of the employer;

(2) Exceeds the administrative law judge's statutory authority;

(3) Is the result of fraud or deceit;

(4) Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

(5) Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

The circuit court's scope of review of an administrative law judge's decision under the grievance statute is limited to the five grounds enumerated above. Parker v. Summers County Bd. of Educ., 185 W. Va. 313, 406 S.E.2d 744 (1991). The Supreme Court of Appeals of West Virginia has held that:

> [g]rievance rulings involve a combination of both deferential and plenary review. Since a reviewing court is obligated to give deference to factual findings rendered by an administrative law judge, a circuit court is not permitted to substitute its judgment for that of the hearing examiner with regard to factual determinations. Credibility determinations made by an administrative law judge are similarly entitled to deference. Plenary review is conducted as to the conclusions of law and the application of law to the facts, which are reviewed de novo.

Syl. Pt. 1, Cahill v. Mercer County Bd. Of Educ., 208 W.Va. 177, 539 S.E.2d 437 (2000).

> In reviewing the decision of an ALJ following a Level IV grievance hearing, the circuit court should give deference to such findings. In Syllabus Point 1 of Randolph County Board of Education v. Scalia, 182 W. Va. 289, 387 S.E.2d 402 (1994), we stated: 'A final order of the hearing examiner for the West Virginia Educational Employees Grievance Board made pursuant to W. Va. Code, 18-29-1, et seq. (1985)[3], and base upon findings of fact should not be reversed unless clearly wrong.'

Martin v. Randolph County Bd. of Educ., 195 W. Va. 297, 304, 465 S.E.2d 399, 406 (1995) citing Randolph County Board of Education v. Scalia, supra at Syl. Pt. 1.

The appellate court is not to substitute its judgment for that of the administrative law judge. Keatley v. Mercer County Bd. of Educ. 200 W. Va. 487, 490 S.E.2d 306 (1997); Martin, supra. If the administrative law judge's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently. Hanlon v. Logan County Bd. of Educ., 210 W. Va. 305, 496 S.E.2d 477 (1997); Board of Educ. of County of Mercer v. Wirt, 192 W. Va. 568, 453 S.E.2d 402 (1994). Petitioner has failed to identify any violations of law or policy, but has instead proposed how this Court should view his application differently than the reviewers at each of the five levels of the process, as well as the ALJ. Not only does such argument by the Petitioner fail to satisfy the law when applied to this issue, but he further frames his arguments with distorted and manipulated data, as is discussed more fully below.

---

[3] This statutory reference is to the grievance procedure for state employees in effect at the time of the decision. The language in the current grievance procedure is the same.

The grievant has the burden of proof and must prove all allegations constituting the grievance by a preponderance of the evidence in all non-disciplinary matters. Procedural Rules of the W. Va. Public Employees Grievance Board, 156 W. Va. Code R. 1 § 3 (2008); Holly v. Logan County Bd. of Educ., Docket No. 96-23-174 (Apr. 30, 1997). This rule has been expressly applied to grievances challenging denial of tenure. Ganikhanov v. West Virginia University, Docket No. 2012-1357-WVU (May 22, 2013); Baroni v. BOD/Fairmont State College, Docket No. 92-BOD-271 (Feb. 11, 1993).

Under *W.Va. Code* § 6C-2-2(i)(1), Grievance "means a claim by an employee alleging a violation, a misapplication or a misinterpretation of the statutes, policies, rules or written agreements applicable to the employee." Although Petitioner has submitted an exhaustive list of reasons he believes the ALJ's Decision to be incorrect, in his grievance as well as the present matter, Petitioner does not identify a single violation of law or policy. Rather, he exhaustively described how he would have, not surprisingly, viewed his application differently, which is not a basis for over-turning the ALJ's decision. The ALJ properly found that Petitioner's comparisons and calculations were not required to be considered in the evaluation, and that much of the information upon which they were based was not even presented to the reviewers. The ALJ rightly determined that Petitioner did not meet his burden of proof in the instant matter, and her decision must be affirmed.

**B. The ALJ's Decision is not arbitrary, capricious, or contrary to law.**

In the instant matter, the ALJ went to great lengths in the "Discussion" portion of her Decision to discuss the evidence presented at Level III, including the extensive evaluation Petitioner received in the tenure process. The ALJ discussed in depth the reviewers' evaluations of Petitioner's tenure application at each level, thoroughly analyzed both documentary evidence and witness testimony, and determined that even though consideration of grant funding was

improper, the other factors used to evaluate Petitioner were properly considered under the tenure policies. (L-III Decision, p. 36) The ALJ found that the funding issue "was cured by analyzing whether the tenure decision was sound without that consideration, [and] the reviewers' decision was not contrary to law or school policy or regulation." (L-III Decision, p. 61) The ALJ held that:

> Grievant was required to demonstrate "effective performance in all major areas of responsibility and excellence in either teaching or research/scholarly activities." In the five-level review process, **Grievant was not found to be excellent in either teaching or research by any person or committee**. Further, the departmental Promotion and Tenure Committee **in both its mid-tenure and pre-tenure reviews noted significant deficiencies in both research and teaching.** These same concerns were **echoed in Grievant's performance reviews.** With the exception of the requirement for external funding, the other factors used to evaluate Grievant for tenure were properly considered under the regulations.

(L-III Dec., p. 36) (Emphasis added) The ALJ further discussed all of the evidence presented regarding Petitioner's lack of excellence in teaching and research. Based upon a careful evaluation and consideration of the evidence, the ALJ concluded that Petitioner could not and did not prove that Marshall's denial of tenure was arbitrary and capricious. Ultimately, the ALJ held that "when viewed as a whole, the reviewers stated rational, relevant reasons supporting their denial of Grievant's tenure."

While Petitioner argues that violations of policy occurred, the ALJ correctly and repeatedly determined that such perceived violations were merely Petitioner's opinions, and that "Grievant points to no applicable regulation or policy that supports his opinions". (L-III Decision, p. 45) Furthermore, the ALJ identified numerous instances throughout her Decision where Petitioner's assertions were either irrelevant or opinion-based, or where he manipulated data and created highly-selective comparisons and self-serving calculations.

The ALJ's lengthy decision included a comprehensive discussion of the evidence and extensive findings of fact. As the ALJ clearly based her findings of fact upon substantial evidence, this Court must affirm the Level III Decision.

The review of a higher education institution's tenure decision is "generally limited to an inquiry into whether the process by which such decisions are made conforms to applicable college policy or was otherwise arbitrary and capricious." Harrison, supra; Nelson v. Bd. of Trustees/W. Va. Univ., Docket No. 99-BOT-514 (June 22, 2001); Baroni v. Bd. of Directors/Fairmont State College, Docket No. 92-BOD-271 (Feb. 11, 1993).

> The review of an institution of higher learning's promotion and tenure decisions is 'generally limited to an inquiry into whether the process by which such decisions are made conforms to applicable college policy or was otherwise arbitrary and capricious.' Karle v. Bd. Of Trustees/Marshall University, Docket No. 98-BOT-258 (Apr. 19, 1999); Harrison v W. Va. Bd. of Directors, Docket No. 93-BOD-400 (Apr. 11, 1995) 'The **decisional subjective process by which promotion and tenure are awarded or denied is best left to the professional judgment of those presumed to possess a special competency in making the evaluation** unless shown to be arbitrary and capricious or clearly wrong.' Siu v Johnson, 784 F.2d 238 (4th Cir. 1984). '**Deference is granted** to the subjective determination made by the **official[s] administering the process.**' Harrison, supra.

Graf v. BOT/West Virginia University, Docket No. 99-GOT-051 (July 8, 1999). (Emphasis added)

Generally, an agency's action is arbitrary and capricious if the agency did not rely on the factors that were intended to be considered, entirely ignored important aspects of the problem, explained its decision in a manner contrary to evidence before it, or reached a decision that is so implausible that it cannot be ascribed to a difference of view. Harper v. Mingo County Bd. of Educ., Docket No. 93-29-064 (Sept. 27, 1993) citing, Bedford County Memorial Hosp. v. Health and Human Serv., 769 F.2d 1017 (4th Cir. 1985). Although the arbitrary and capricious standard of review requires a searching and careful inquiry into the facts, the ultimate scope of review is

Docket No. 97-BOT-359 (Apr. 30, 1998) (citations omitted). See also, Castiglia v. Bd. of Trustees, Docket No. 97-BOT-360 (May 27, 1998).

Brozik v. Bd. of Trustees, Docket No. 98-BOT-142 (Nov. 30, 1998). (Emphasis Added) The ALJ identified numerous instances where Petitioner presented as evidence at hearing, just as he does before this Court, information that was not presented to the tenure reviewers, and therefore not available for review at the time his application was evaluated. Accordingly, such evidence was not properly at issue during the Level III hearing, and is not proper for consideration on appeal to this Court. The evidence is clear that based upon the professional judgment of the officials reviewing Petitioner's application that they found that he had failed to meet the standard of "excellence" required for promotion.

In the fall of 2015, Petitioner applied for tenure. The SOM Regs, MU-AA-28, HEPC Series 9, and The Greenbook establish the criteria applicable for tenure. (L-III Resp. Exh. 1, 2, 3 & 4) These guidelines require the applicant to demonstrate excellence in either of two areas: Teaching or Research/Scholarly Activities. (L-III Resp. Exh. 1, 2, 3 & 4). Specifically, the SOM Regs require the applicant to demonstrate "effective performance in all major areas of responsibility and **excellence in either teaching or research/scholarly activities**." (Emphasis added.) (L-III Resp. Exh. 1) Unanimously, at all five (5) levels, the evaluators found that Petitioner did not demonstrate excellence in either teaching or research. (L-III Resp. Exh. 10)

Petitioner failed to present any relevant, credible evidence that his tenure denial was the result of an arbitrary or capricious decision. Petitioner argued that he achieved a level of excellence in both categories, and attempted to bolster his argument by citing isolated comparisons to other tenured faculty using highly selective data calculations to support his argument. By his own admission, Petitioner created and calculated his own adjusted averages by improperly either including or excluding related data based on his own unsupported opinions of how the reviewers should have evaluated his application. (L-III Trans. at p. 797, ln. 16 – p. 809, ln. 24) Aside from

narrow, and the reviewing court is not empowered to substitute its judgment for that of the State Agency. Harrison v. Ginsberg, 169 W. Va. 162, 286 S.E.2d 276 (1982).

If the officials administering the process did not act in an arbitrary and capricious or clearly wrong manner, their employment decision must be upheld. The tenure decision in this matter was neither arbitrary nor capricious, but was consistent with the contents of the application and *curriculum vitae* submitted by Petitioner and the relevant tenure policies. In the present matter, each of the five (5) witnesses who participated in Petitioner's tenure review process testified extensively regarding the full scope of their reviews. The ALJ found that the reviewers' decisions were supported by the evidence in the record, and were consistent with the policy requirements governing tenure.

In the current case, the decision to deny tenure for the Petitioner was not contrary to evidence nor arbitrary or capricious. The individuals responsible for administering the tenure process relied on the factors that were intended to be considered and applied all applicable policies and rules to reach a decision.

"The decisional subjective process by which promotion and tenure are awarded or denied is best left to the professional judgement of those presumed to possess a special competency in making the evaluation unless shown to be arbitrary and capricious or clearly wrong." Cohen v. W. Va. Univ., Docket No. BOR1-86-247-2 (July 7, 1987). See Siu v. Johnson, 748 F. 2d 238 (4th Cir. 1984)

Further,

> [t]he undersigned "is **limited to considering the record before the decisionmaker at the time of the decision.** An applicant is responsible for informing the decisionmaker of [his] qualifications for promotion. If [he] does not do so at the appropriate time, such data cannot be considered later by an Administrative Law Judge, as the purpose of a promotion grievance is to assess the institution's decision at the time it was made, utilizing the data it had before it." Baker v. Bd. of Trustees,

the fact that the ALJ properly determined that his calculations were irrelevant to the issue at hand, Petitioner offered highly-selective and self-serving calculations that either included data which should have been excluded because they occurred outside the employment periods evaluated for tenure, or that excluded data which would have been considered in the official tenure evaluations of Petitioner and the comparators he selected.

For instance, to name just a few, Petitioner included courses he taught during the Spring 2016 semester to derive his student teaching evaluation scores, yet those courses were not, and could not be, included in his tenure application or the tenure decision because they were taught **after** he submitted his application. (L-III Gr. Exh. 3, page 29) Petitioner calculated his teaching scores by using data from only a two-year period, not the entire period included in his tenure evaluation, and excluded his graduate education courses from the calculation. (L-III Gr. Exh. 3, pg. 31) Petitioner calculated teaching loads based only on second year medical students while excluding courses taught to graduate students. (L-III Gr. Exh. 3, pg. 32) Clearly, Petitioner created invalid, unreliable comparisons using data that was selectively, and improperly, either excluded and/or included to arrive at his desired results. As such, Petitioner's evidence does not support his assertions that his tenure application was improperly evaluated and should have been evaluated differently. In fact, Respondent's witnesses testified extensively about the specific and thorough consideration Petitioner's application received, including consideration of the criteria required by the tenure policies.

Petitioner further argued that the decision to deny tenure was arbitrary and capricious, pointing to a number of elements he believes should have been considered, such as changes in the research funding climate and the impact factor values for his publications, yet he presented absolutely no evidence to support his claims that such factors should have been weighted in his favor or even considered. (L-III Gr. Exh. 3) Petitioner provided no evidence to support his

contentions that Marshall's officials should have applied his own convoluted analysis of his tenure application.

**C. The ALJ properly determined that Petitioner was not subject to discrimination.**

The ALJ correctly determined that neither Dr. D████ nor Dr. K██ were similarly situated to Petitioner, and therefore there could be no finding of discrimination. For purposes of the grievance procedure, discrimination is defined as "any differences in the treatment of similarly situated employees, unless the differences are related to the actual job responsibilities of the employees or are agreed to in writing by the employees." *W.Va. Code* § 6C-2-2 (d). In order to establish a discrimination claim asserted under the grievance statutes, an employee must prove:

> (a) That he or she has been treated differently from one or more similarly-situated employee(s);
>
> (b) That the different treatment is not related to the actual job responsibilities of the employees; and,
>
> (c) That the difference in treatment was not agreed to in writing by the employee.

Frymier v. Higher Education Policy Comm'n, 655 S.E.2d 52, 221 W. Va. 306 (2007); Harris v. Dep't of Transp., Docket No. 2008-1594-DOT (Dec. 15, 2008). The ALJ properly determined that Dr. D████ was not similarly situated to Petitioner because he was an Assistant professor and Petitioner was an Associate Professor. Employees must be employed in the same position to be similarly situated. The ALJ found that Dr. K██ was not similarly situated because the difference in treatment between her and Petitioner was stated, and agreed to in writing, by each individual in their employment contracts. The ALJ properly determined that Petitioner did not establish the essential elements of a discrimination claim, and therefore failed to prove that he was subject to discrimination. Accordingly, the ALJ's Decision must be affirmed.

**D. There was no interference in Petitioner's tenure evaluation process.**

The ALJ correctly determined there was no interference in Petitioner's tenure evaluation

process. Both Dr. Hardman and Dr. Beaver testified that they were not even remotely influenced by Dr. Primerano's email indicating that he would not be recommending Petitioner for tenure. Dr. Primerano testified to the innocent nature of his email, whereby he was seeking guidance for completing the tenure review form because it provided a check-box option only to recommend tenure. (L-III Trans. at p. 819, ln. 10 – p. 821, ln. 10) Furthermore, Dr. Primerano testified to his legitimate role as a participant in the Dept. P&T Committee's activities prior to its vote on Petitioner's application because he served as an ex-officio member of that committee until he was appointed Interim Chair of the Department on July 1, 2014. (L-III Trans. at p. 819, ln. 10 – p. 821, ln. 10) The record is void of any evidence whatsoever to support Petitioner's assertion that any interference occurred in his tenure review process. Additionally, Petitioner failed to show that Dr. Primerano's action violated any policy or procedure, that any procedural errors resulted, or that the tenure process would have resulted in a different decision had the events not occurred.

> While an agency is required to abide by its own lawfully established policies, its actions will not always be reversed where it has failed to follow its policies. "The Petitioner must prove that the error was harmful, in that 'a different result would likely have occurred. . . . [s]imply stated, if the same result was inevitable, regardless of [adherence to proper procedure], Petitioner has not suffered harm from the identified procedural error.' McFadden v. W. Va. Dept. of Health and Human Resources, Docket No. 94-HHR-428 (Feb. 17, 1995) at 10." Kloc v. Bd. of Trustees, Docket No. 96-BOT-507 (Aug. 20, 1997). See Farley v. Dep't of Health and Human Res., Docket No. 02-HHR-0888D (May 8, 2002); Walker v. Dep't of Pub. Safety, Docket No. 98-DPS-056 (Sept. 11, 1998).

Birchfield v. W. Va. Lottery Commission, Docket No. 05-LC-363 (Jan. 31, 2008).


### E. The ALJ correctly determined that the portion of the grievance related to Grievant's challenge of his employment end date was untimely.

The ALJ correctly determined that Petitioner's challenge to his employment end date was untimely. Such determination further negates Petitioner's allegations of retaliation by threatening

early termination on June 30, 2016, in that his employment end date was settled and unequivocally made known to Petitioner long before he applied for, and was denied, tenure.

*West Virginia Code* § 6C-2-3(a)(1) requires an employee to "file a grievance within the time limits specified in this article." *West Virginia Code* § 6C-2-4(a)(1) identifies the timelines for filing a grievance and states,

> Within fifteen days following the occurrence of the event upon which the grievance is based, or within fifteen days of the date upon which the event became known to the employee, or within fifteen days of the most recent occurrence of a continuing practice giving rise to a grievance, an employee may file a written grievance with the chief administrator stating the nature of the grievance and the relief requested and request either a conference or a hearing.

The time period for filing a grievance ordinarily begins to run when the employee is unequivocally notified of the decision being challenged. See Rose v. Raleigh County Bd. of Educ., 199 W. Va. 220, 483 S.E.2d 566 (1997); Naylor v. W. Va. Human Rights Comm'n, 180 W. Va. 634, 378 S.E.2d 843 (1989).

Petitioner was clearly informed by his appointment letter, the provisions of SOM Regs, MU-AA-28, HEPC Series 9, and the letter of March 24, 2015, that his employment would end on June 30, 2016, if he did not achieve tenure. (L-III Resp. Exh. 1, 2, 3, 9 & 12). Petitioner received the latest of those notifications, the letter of March 24, 2015, more than a year prior to filing his grievance.

Petitioner had been on notice from the time he signed his appointment letter in 2009 that his initial term of employment, as well as each yearly renewal term, began on July 1 and expired on June 30. As stated in his appointment letter, Petitioner's employment was "effective on or about September 1, 2009 and **renewable at the beginning of each fiscal year**". (Emphasis added.) (L-III Resp. Exh. 9) The appointment letter further stated that Petitioner's initial offer of appointment was "**for the fiscal year beginning July 1, 2009 and ending June 30, 2010**."

(Emphasis added.) (L-III Resp. Exh. 9) These contract terms are consistent with the provisions of HEPC Series 9, which requires faculty appointments to be set on a fiscal year basis, and expire at the end of the seventh year of appointment if tenure is not achieved. HEPC Series 9, states in relevant part

> 3.1.4. Every faculty contract at any institution shall be for one **fiscal year, or part thereof,** in accordance with and in compliance with the annual budget of the institution, or supplementary actions thereto, as provided by law.

(Emphasis added.) (L-III Resp. Exh. 3) Thus, even at the time of Petitioner's initial appointment, his employment was scheduled to expire on June 30, 2016, if he did not achieve tenure.

Additionally, the ALJ found that Petitioner was clearly informed by letter dated March 24, 2015, by Dr. Primerano and Dr. Shapiro that his contract of employment would expire June 30, 2016, if he did not achieve tenure, considering that Petitioner acknowledged receiving the March 24th letter in an email to Dr. Primerano on May 7, 2015. (L-III Resp. Exh. 12) Petitioner's email unambiguously referenced "the letter from you and the dean" and expressly stated that Petitioner was concerned that the letter "stated that June 30, 2016 as [sic] the end date of my contract if tenure is not approved." (L-III Resp. Exh. 12)

Petitioner's grievance was not filed until on or about May 17, 2016. Without question, Petitioner has not met the statutory fifteen-day filing requirement, and the ALJ properly determined that his challenge to the employment end date was untimely. Therefore, his allegations of retaliation are without merit, and his Petition must be denied.

## CONCLUSION

The ALJ in this matter clearly considered all of the relevant factors in making her decision that the Petitioner failed to meet his burden of proof and further, failed to demonstrate Respondent's denial of tenure was arbitrary and capricious, clearly wrong, or a violation of law or policy. WHEREFORE, the ALJ's decision must be AFFIRMED and the appeal DISMISSED.

## CONCLUSIONS OF LAW

1. *West Virginia Code* §6C-2-5 (2007) defines enforcement and reviewability of decisions conducted before the West Virginia Public Employees Grievance Board. Specifically, the decision of an administrative law judge cannot be reversed on appeal unless the circuit court finds that the Administrative Law Judge's decision:

>   (1)   Is contrary to law or a lawfully adopted rule or written policy of the employer;
>   (2)   Exceeds the administrative law judge's statutory authority;
>   (3)   Is the result of fraud or deceit;
>   (4)   Is clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or
>   (5)   Is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

2. The circuit court's scope of review of an administrative law judge's decision under the grievance statute is limited to the five-grounds enumerated above. Parker v. Summers County Bd. of Educ., 185 W. Va. 313, 406 S.E.2d 744 (1991)

3. The appellate court is not to substitute its judgment for that of the administrative law judge. Keatley v. Mercer County Bd. of Educ. 200 W. Va. 487, 490 S.E.2d 306 (1997); Martin v. Randolph County Bd. of Educ., 195 W. Va. 297, 304, 465 S.E.2d 399, 406 (1995). If the administrative law judge's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently. Hanlon v. Logan County Bd. of Educ., 210 W. Va. 305, 496 S.E.2d 477 (1997); Board of Educ. of County of Mercer v. Wirt, 192 W. Va. 568, 453 S.E.2d 402 (1994).

4. The ALJ's decision that the tenure reviewers' decision was "sound" and "not contrary to law or school policy or regulation" is plausible when the evidence is viewed in its entirety. "The decisional subjective process by which promotion and tenure are awarded or denied is best left to the professional judgement of those presumed to possess a special competency in making

the evaluation unless shown to be arbitrary and capricious or clearly wrong." Cohen v. W. Va. Univ., Docket No. BOR1-86-247-2 (July 7, 1987). See Siu v. Johnson, 748 F. 2d 238 (4th Cir. 1984).

5. The review of an institution of higher learning promotion decision is "generally limited to an inquiry into whether the process by which such decisions are made conforms to applicable college policy or was otherwise arbitrary and capricious." Karle v. Bd. Of Trustees/Marshall University, Docket No. 98-BOT-258 (Apr. 19, 1999) As the ALJ found that the tenure decision was supported by the evidence in the record and the individuals responsible for administering the tenure process relied on the factors that were intended to be considered, her decision must be upheld.

6. *West Virginia Code* § 6C-2-3(a)(1) requires an employee to "file a grievance within the time limits specified in this article." *West Virginia Code* § 6C-2-4(a)(1) identifies the timelines for filing a grievance and states,

> Within fifteen days following the occurrence of the event upon which the grievance is based, or within fifteen days of the date upon which the event became known to the employee, or within fifteen days of the most recent occurrence of a continuing practice giving rise to a grievance, an employee may file a written grievance with the chief administrator stating the nature of the grievance and the relief requested and request either a conference or a hearing.

The time period for filing a grievance ordinarily begins to run when the employee is unequivocally notified of the decision being challenged. See Rose v. Raleigh County Bd. of Educ., 199 W. Va. 220, 483 S.E.2d 566 (1997); Naylor v. W. Va. Human Rights Comm'n, 180 W. Va. 634, 378 S.E.2d 843 (1989). As the evidence clearly supports the ALJ's decision that Petitioner's challenge to his employment end date was untimely, the decision must be upheld.

WHEREFORE, the Court does hereby **DENY** the relief sought by Petitioner and **ORDERS** that this matter be **DISMISSED WITH PREJUDICE**.

The Court preserves the Petitioner's objection and exception to its ruling. This Court further **ORDERS** that the Circuit Clerk shall distribute certified copies of this Order to counsel of record and shall **DISMISS** and **REMOVE** this action from the docket of this Court.

ENTERED this the ___ day of _____ Nov. ___, 2018.

_____
Honorable Charles E. King, Jr., Judge

Prepared for entry by:

STATE OF WEST VIRGINIA
COUNTY OF KANAWHA, SS
I, CATHY S. GATSON, CLERK OF THE CIRCUIT COURT OF SAID COUNTY
AND IN SAID STATE, DO HEREBY CERTIFY THAT THE FOREGOING
IS A TRUE COPY FROM THE RECORDS OF SAID COURT
GIVEN UNDER MY HAND AND SEAL OF SAID COURT THIS
DAY OF _____
_____ CLERK
CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

_____/S/ Candace Kraus_____
Candace Kraus, State Bar No. 6568
Deputy General Counsel
West Virginia Higher Education Policy Commission
West Virginia Community and Technical College System
1018 Kanawha Blvd., East
8th Floor – Legal Division
Charleston, West Virginia 25301
304.558.2102 (phone) and 304.558.4820 (fax)
*Counsel for Respondent*